IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 1, 2020 Session

## IN RE HADLEY R.

**Appeal from the Chancery Court for Campbell County**
**No. 2019-CV-82     Elizabeth C. Asbury, Chancellor**

_____

## No. E2020-00256-COA-R3-PT
_____

Scarlett B. ("Mother") appeals the termination of her parental rights to the minor child, Hadley R. ("the Child").  In April 2019, Christy D. ("Petitioner") filed a petition to terminate Mother's parental rights in the Campbell County Chancery Court ("Trial Court").  Following a trial, the Trial Court terminated Mother's parental rights on three grounds of abandonment due to Mother's failure to visit the Child, failure to support the Child, and wanton disregard for the Child's welfare.  The Trial Court further found that termination of Mother's parental rights was in the Child's best interest.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Beverly D. Nelms, Knoxville, Tennessee, and William F. Evans, Jacksboro, Tennessee, for the appellant, Scarlett B.

Adam M. Bullock, Lafollette, Tennessee, for the appellee, Christy D.

# OPINION

## Background

The Child was born in 2016 and initially lived with Mother and the biological father, Travis R. ("Father").[1]  Both parents were subsequently arrested, and Petitioner picked the Child up in April 2016 from a family member of father who could no longer care for the Child.  Soon after, Petitioner filed a petition in the Campbell County Juvenile Court ("Juvenile Court"), seeking temporary custody of the Child and alleging that the Child was dependent and neglected due to the incarceration and drug use by the parents.[2]  The Juvenile Court entered an *ex parte* protective custody order placing the Child with Petitioner pending further hearing.  Mother testified during the termination trial that the dependency and neglect was filed "[b]ecause we had a night out and had got in trouble, and I – well, I had got a DUI and wrecked and was in jail for four days."  Mother testified that she was later convicted of that offense.

The Juvenile Court conducted an adjudicatory hearing in September 2016, finding that Mother had waived her adjudicatory hearing and stipulated that the Child was dependent and neglected due to Mother's unavailability to care for the Child when the petition was filed.  The Juvenile Court further found that the Child would remain in the custody of Petitioner and that the parents could receive supervised visitation to be supervised by Petitioner or Missy F., Mother's aunt.[3]  The Juvenile Court subsequently conducted a judicial review hearing in December 2016 and ordered that custody of the Child would remain with Petitioner and that the parents could have unsupervised visitation with the Child at Petitioner's discretion as long as the parents were in compliance with their alcohol and drug treatment.  The Juvenile Court later closed its case in March 2017, leaving the visitation order unchanged.

In April 2019, Petitioner filed a petition for adoption and to terminate the parental rights of Mother and Father in the Campbell County Chancery Court ("Trial Court"), alleging as grounds for termination that Mother had abandoned the Child by her failure to visit the Child, failure to financially support the Child, and wanton disregard for the Child's welfare.  Mother subsequently filed an answer denying that grounds existed to terminate her parental rights and that termination of Mother's parental rights was in the Child's best interest.  Petitioner also filed with the Trial Court a response from the putative father

---

[1] The father, Travis R., did not file a notice of appeal and has not filed an appellate brief in this matter. Because Father has not participated in this appeal, we will include only those facts relevant to Mother and the termination of her parental rights.

[2] Petitioner was married to Mother's uncle prior to their divorce in the 1990s.

[3] We will refer to some individuals by their first name for ease of reading.  No disrespect is intended.

registry and a "Home Study Report," which approved of Petitioner's home as fit for adoption of the Child.

The Trial Court conducted a trial on two nonconsecutive days in November 2019. The Child was around three and a half years old at the time of trial. During trial, the following witnesses testified: (1) Petitioner; (2) Father; (3) Mother; (4) Pamela M., a friend of Petitioner; (5) Mandi F., Mother's cousin; (6) Missy F., Mother's aunt; and (7) Patricia C., Mother's grandmother. Petitioner testified as the first witness during trial. According to Petitioner, she resided in Lafollette, Tennessee and was employed in Lenoir City. Petitioner testified that she had custody of the child continuously since April 2016 and that she had provided for the Child's needs throughout her life, including clothing, medical care, food, and shelter. Petitioner further testified that she had a strong bond with the Child and that Mother had no relationship with the Child. Petitioner testified that she decided that she did not want to use corporal punishment on the Child, and when the Child was an infant, she would instead put pressure on the Child's hand as a form of discipline. According to Petitioner, a doctor had told her that she had used that form of discipline on her own children. After the Child was older, Petitioner used time outs as punishment for the Child.

Petitioner testified that the parents were given supervised visitation at her discretion. According to Petitioner, the parents "received a lot of visitation" for the first year she had the Child but that they had also missed some visitation they had scheduled. Petitioner stated that if the parents came to a supervised visit while under the influence, they did not get to stay for the visit because "someone that's high has no business being around a child." Petitioner testified of the Juvenile Court's more recent court order allowing unsupervised visitation between Mother and the Child, at Petitioner's discretion, if Mother was in compliance with her alcohol and drug treatment.

In February 2017, Petitioner allowed Mother to have an unsupervised visit with the Child. Petitioner permitted Mother to stay in Petitioner's home overnight with the Child to see the Child's routine. The Child slept in a "Pack 'n Play" in Petitioner's bedroom, which was approximately fifteen to twenty feet from where Mother was sleeping on the couch. Mother was supposed to care for the Child while Petitioner was at work. Petitioner left for work at approximately 8:30 A.M. while the Child and Mother were still sleeping. Mother's aunt, Missy F., planned to pick up Mother and the Child at 10:30 A.M. from Petitioner's home. Missy had called Mother but she did not answer her phone calls. At approximately 10:00 A.M., Petitioner went to the home to check on Mother and the Child. Upon her arrival, Petitioner heard the Child crying from inside the home as Petitioner exited her vehicle in the carport.

Mother was asleep on the couch when Petitioner entered the home. When Petitioner found the Child, the Child was still in her Pack 'n Play, had been uncontrollably crying, and had not been fed. Petitioner testified that the Child appeared terrified, had a soiled

diaper, and had hives on her face from crying. Petitioner stated that the Child was "clawing" at Petitioner's clothing when she picked her up. According to Petitioner, this was not normal behavior for the Child. She testified that the Child's body was still shaking for at least an hour after she returned to work with the Child. Petitioner further testified that the Child had a dirty diaper and that her "bottom" was raw and red for several hours. Petitioner gathered the Child's things, left the home with the Child without waking Mother, and took the Child back to work with her. Mother did not even know Petitioner had been in the home. According to Petitioner, anyone could have come into the house and taken the Child. Petitioner testified that she informed Missy that she had the Child with her at work. When Mother woke up, she called Missy, who was on her way to Petitioner's work to pick up the Child. Petitioner testified that this incident was concerning for her and that it was Mother's only unsupervised visit with the Child.

During Petitioner's testimony concerning Mother's visitation, Father's attorney objected to a question asked by the Guardian Ad Litem, and Mother's attorney stated that the Juvenile Court's order only required Mother to be in compliance with the alcohol and drug treatment, not for her to provide proof of such compliance to Petitioner. In response, the Trial Court stated as follows:

> I'm going to let the witness answer the question, but the court order clearly says it's in the custodian's discretion as long as the parents are in compliance with their A&D treatment. You know, I, as the judge of this court, I am not going to require [Petitioner] to go track down their A&D treatment records. She would not be able to get them. The only way that she could get them would be through the parents or someone with authority. She would be violating HIPAA if she went and tried to get them.

Petitioner's understanding of the Juvenile Court's visitation order was that she was responsible for the Child and needed something in writing demonstrating that Mother had been clean for a period of time. According to Petitioner, one clean drug screen was not enough. Petitioner confirmed that she had never received documentation regarding Mother's compliance with any alcohol and drug treatment program.

Petitioner testified that Mother last visited with the Child on October 29, 2017, prior to the termination proceedings. Petitioner stated that Mother asked to visit with the Child in March 2018. Petitioner explained that she denied that visit because she knew Mother was not clean and the last time she allowed the Child to be in Mother's care for the unsupervised visit did not go well. Petitioner further testified that Mother requested to visit with the Child after Mother was released from jail in July 2019. According to Petitioner, she did not respond to Mother's request because they both had attorneys, and they should speak through their attorneys. Petitioner denied that she ever was served with a petition by Mother to establish visitation or a contempt action alleging that Petitioner had violated the visitation order.

Petitioner testified that Mother had provided formula for the Child a few times and baby food a couple of times during the first year. Mother also provided a gallon of milk, some Easter candy, and an Easter basket for the Child in March 2018. Petitioner, however, testified that Mother never provided any monetary support for the Child. Petitioner testified that she had no knowledge of Mother's employment prior to her incarceration.

Mother also testified during trial. Mother was released from jail in July 2019 and had been living at Oxford House, which Mother described as a "sober living" house and compared it to a halfway house. Mother had been living at Oxford House for four months. Mother testified that the Child was removed from her custody because she went to jail for four days after wrecking a vehicle and being arrested for her second offense of driving under the influence. Mother testified that the criminal charge and subsequent conviction stemmed from medication she had been prescribed and not alcohol. Mother specifically identified Klonopin as her prescribed medication that had caused the driving under the influence charge.

Mother testified concerning her criminal history. Since getting out of jail, Mother is currently on probation for a felony and expects to be on probation for three years. Mother testified that she had been arrested about twenty or twenty-five times and that she had been charged with possession of drug paraphernalia, theft over $2,500, aggravated burglary, having contraband in a penal facility, theft of up to $1,000, and driving under the influence, some of which were felonies. According to Mother, those charges resulted from her drug use and she was "not that person anymore."

Mother testified concerning her recent incarceration. According to Mother, she was incarcerated because she had violated her probation by incurring pending charges, one of which was theft. Mother referred to an incident with a phone where she "ended up with the phone, and then had [her] grandmother take the phone down to the police station." Mother stated that she was not "trying to bluntly steal the phone." According to Mother, she was high on Klonopin and methamphetamine when she incurred the pending charge in violation of her probation. Due to the new charges and the violation of probation, Mother was arrested in October 2018.

Concerning her drug use, Mother testified that she previously had been prescribed Suboxone and Klonopin. Mother first obtained a prescription for Subutex when she was pregnant with the Child and had been going to the Suboxone clinic on and off for about three years. According to Mother, she was prescribed three strips of Suboxone per day but only took up to one strip per day and usually only took half a strip a day. Mother explained that she would save the strips and skip months going to the clinic. When asked by the Guardian Ad Litem if she traded the strips for methamphetamine, Mother replied, "Yeah, I'm sure I did at times."

- 5 -

Mother admitted that she had abused Opana, that Opana was her drug of choice, and that she had used methamphetamine. Mother admitted being addicted to Opana. According to Mother, she became ill with endocarditis, an infection around her heart, due to her use of Opana. Mother testified that after recovering from her illness, she did not go back to using Opana but had gotten a prescription for Suboxone. Mother admitted that she had relapsed with methamphetamine in either early 2016 or 2017 for about six months. According to Mother, she used methamphetamine about two or three times a week for six months. Mother initially denied being addicted to methamphetamine but then stated that she "probably was addicted to meth." Mother acknowledged that she had probably showed up for visits "under the influence of something" and that she was high on her prescribed drugs of Suboxone and Klonopin during at least some of the visits. Mother attended drug treatment programs both before and after the Child was born. However, Mother stated that she never worked a program before until the program while at Oxford House where she currently resides. Mother further testified that she never provided Petitioner with either a nail bed or hair follicle drug screen.

Mother testified that she had been incarcerated for nine months from October 2018 through July 2019. Mother further testified that she had provided Petitioner with $200 per week for the Child in either 2016 or 2017. According to Mother, Petitioner did not use the money and she eventually got the money back. Mother testified that Petitioner told her that she did not want her money. Mother did not offer money to Petitioner again after that. Mother acknowledged during trial that she had not made any payments toward child support for the Child from June 2018 through October 2018. According to Mother, the first she heard about child support was when she was served with the termination petition.

Mother acknowledged that she left the Child on her EBT card for about a year after she lost custody of her but stated that she continued taking groceries to Patricia's home for the Child. According to Mother, she had taken "milk and stuff" for the Child to Petitioner's house twice in 2016 or 2017. She said she had purchased clothing for the Child but Petitioner did not need them and told her to take them back. She had also given a stuffed animal to Missy to give to the Child. Mother testified that she had the ability to work during the four months prior to her incarceration and that she had worked at Adient for a month during that time. According to Mother, she lost her job after her background check came back.

At one point, Mother had been doing well, and they were beginning to transition the Child back to Mother. However, Mother acknowledged that she had been responsible for messing up the transition. Mother referred to the overnight visit with the Child and stated that Petitioner told her to make sure she got up. However, Mother testified that she figured Petitioner would wake her up before she left for work. According to Mother, she did not wake up with the Child during the visit. Mother testified that she was clean and sober at the time but that she had been prescribed Seroquel. After Mother woke up, she spoke with

Missy. Mother was not permitted to have any other unsupervised visits with the Child after that visit.

Mother testified that she was not sure whether she had visited or requested a visit during the relevant four-month period. According to Mother, she had sent text messages to Petitioner requesting visitation with the Child, but they had been unanswered. She testified that after Petitioner told her no "for so long," she would call her grandmother or Missy to check on the Child. Mother acknowledged that she had five different phones from which she had made visitation requests, each having a different phone number. Mother testified that she "would call and put in the text message, 'This is Scarlett'" to let Petitioner know it was her phone number.

Mother further testified of three specific times Petitioner had denied visitation to Mother. During one of those times in September 2018, Mother was driving by Petitioner's work after leaving her MIST program and spontaneously stopped by Petitioner's office to show her a negative drug screen and to request a visit. This occurred during the four months prior to Mother's incarceration. Mother testified that she was sober at the time and had been sober for three weeks. According to Mother, Petitioner said the drug screen may be "bogus" and Mother left. Mother testified that the urine drug screen came from Ridgeview and was supervised. The second instance Mother testified to was around 2017 when she called Petitioner to request a visit but was denied. She dropped off some milk and baby food at Petitioner's home instead. According to Mother, the third time she was denied a visit, she called from her grandmother's home and Petitioner told her that it would not be in the Child's best interest to see her.

Mother testified that she had been clean for one year and twelve days at the time of trial, which included several months while she was incarcerated and the four months after her release. According to Mother, she had a job working as a server at Texas Roadhouse, had taken a parenting class, was attending Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings, had a sponsor, was working the steps of her program, was currently on step three of a twelve step program, was going to probation each week, had complied with random drug screens, and was attending church in Lenoir City. Mother stated that she had taken the parenting class about two months prior to trial. Mother testified that she had five clean drug screens since being released from jail, three at Oxford House and two with her probation. Mother testified that the Child could stay with her three nights a week at Oxford House or she could move to another "mommy-and-me house" where the Child could stay seven days a week with Mother.

Petitioner called Pamela M. as her next witness. Pamela testified that she and Petitioner were childhood friends and that the Child calls her "memaw." According to Pamela, Petitioner loves the Child and treats her like she is her own child. Pamela testified that she had never observed Petitioner being mean to the Child or disciplining the Child in a harsh way. Pamela stated that the Child had become a beautiful little girl and that she

was "totally amazing" and "awesome." Pamela testified that she had seen Mother at Burger King in July 2018, when Mother took a cell phone of hers.

Mother called Mandi F. as a witness on her behalf. Mandi is Mother's cousin. Mandi testified that Mother was sober. Mandi further testified that she had never seen Mother be the person she was at the time of trial and that Mother had never tried before. Mandi acknowledged Mother's "extensive" drug history and observing Mother under the influence since the Child was born, but she stated that Mother had shown improvement and had been "completely sober." According to Mandi, she observed Petitioner pinch or hold pressure on the Child's hand while in the car as discipline and the Child said, "ouch."

Mother also called Missy F. as a witness. Missy testified that she had seen changes in Mother. According to Missy, Mother had been growing and working on herself. Mother had been more responsible, had been attending NA meetings and was trying to go to church when she could. Missy testified that she is not aware of Mother using any drugs since she got out of jail. Missy further testified that she believed that Mother had provided money for the Child to Petitioner when Mother worked at Campos, which Mother testified was in either 2016 or 2017. According to Missy, Mother had bought groceries for the Child but it had been "a long time" prior when the Child would stay with Patricia. Missy testified that she had never observed Petitioner deny a visit to Mother.

Missy testified that for much of the Child's life, she kept the child overnight each week from Sunday until Petitioner picked the Child up on Wednesday. She and Petitioner had divided up time to balance taking care of the Child. However, a month prior, Missy began keeping the Child during the day on Mondays, Tuesdays, and Thursdays and for a couple hours on Wednesdays and Fridays each week. According to Missy, she and Petitioner got along fine and did not get into an argument. Missy testified that she guessed "it was time to get [the Child] used to being in one place." She further testified that Petitioner took care of the Child and treated the Child like her own daughter. Missy stated that Petitioner had provided the Child with a safe and loving home and that there was a strong bond between the Child and Petitioner. Missy denied ever observing Petitioner mistreat the Child.

Mother called Patricia C. as her final witness. Patricia testified that she used to keep the Child a couple days a week and that Mother had brought formula, baby food, and snacks for the Child during that time. Mother had also brought some outfits, toys, and books for the Child with the last time being in late 2017. Patricia testified that Mother called Petitioner from her house twice to request a visit with the Child in 2017 or early 2018 but that Petitioner had denied those visits, stating that she was at work and did not "have time to fool with [Mother]." Patricia testified that she had not kept the Child since she was twenty months old. Patricia is still close with Mother and testified that she had noticed a change in Mother. Patricia acknowledged that Mother had been an addict for a long time and stated that she had turned Mother away from visiting the Child before when Mother

came to visit while under the influence. However, Patricia testified that Mother is "clean" and "like a different person."

Upon the conclusion of trial, the Trial Court took the matter under advisement and informed the parties that it would enter its written order with findings of fact and conclusions of law within thirty days. The Trial Court thereafter prepared its "Findings of Fact, Conclusions of Law, and Opinion of the Court." Concerning the termination of Mother's parental rights, the Trial Court found the following facts:

1. [The Child] was born [in February] 2016. [Mother] is the biological mother and [Father] is the biological father.

2. After leaving the hospital following birth, the child resided with [Mother] and [Father] until on or about April 3, 2016.

3. The child began residing in the physical care of [Petitioner] on or about April 3, 2016 after the parents were arrested and placed in jail as the result of a DUI related car wreck.

4. [Petitioner's] ex-husband was a maternal relative of the child. Various maternal family members decided that [Petitioner] was the person who should seek custody of the child. [Petitioner] was previously married to the child's uncle. Thus, [Petitioner] filed a Petition in the Campbell County Juvenile Court on April 5, 2016 seeking custody of the child.

5. On or about September 14, 2016, [Mother] and [Father] appeared in Campbell County Juvenile Court, both with Court appointed counsel, and waived their right to an adjudicatory hearing and stipulated that the child was dependent and neglected in their care. The ORDER provided that the parents could have visits with the child supervised by [Petitioner] or by Missy [F.] with the time/date to be agreed upon by the parties.

6. At the December 14, 2016 court review the Court added the following provision regarding visitation: "The parents may begin enjoying unsupervised visits at the custodian's discretion as long as they are in compliance with their alcohol and drug treatment".

7. The final review took place on March 20, 2017. The visitation remained as set forth in the prior Order and the case was closed.

8. The child has continued to reside with Petitioner. Petitioner has had the assistance of Missy [F.] and other family members.

9. [Petitioner] filed this PETITION FOR ADOPTION AND FOR TERMINATION FOR PARENTAL RIGHTS on April 12, 2019. She alleged abandonment and willful failure to visit and willful failure to support as to both parents. Further, she alleged wanton disregard based on the conduct of both parents. Additionally, she alleged the that pertinent four (4) month period as to Mother would be the four (4) month period prior to her incarceration since she was jailed at the time of the filing of the PETITION. Further, Petitioner alleges that termination of parental rights and adoption is in the best interest of the child.

* * *

11. AS TO MOTHER, SCARLETT [B.]:

(1) Shortly after the birth of the child, [Mother] admitted that she and [Father] were criminally charged as a result of a wreck. She was charged with DUI and ultimately convicted. She admitted having being arrested 20 to 25 times. She admitted having felony convictions as well as misdemeanor convictions. She admitted that her drug of choice was Suboxone and Klonopin. She admitted to abusing Opana. She admitted using Methamphetamine for approximately six (6) months but denied a Methamphetamine addiction.

(2) She was incarcerated for a period of nine (9) months from on or about October 5, 2018 through July, 2019. Therefore, the relevant four (4) month period of time for statutory purposes is on or about June 5, 2018 through October 5, 2018.

(3) [Mother] admitted that she had no visits with the child from June, 2018 through October, 2018. Her position is that she had previously asked for visitation on many occasions but was denied by [Petitioner]. She finally quit asking.

(4) A pertinent fact is that in or about February, 2017 and after a period of supervised visits, [Petitioner] decided to give [Mother] an opportunity for an unsupervised visit in an effort to transition the child back to [Mother]. Apparently, [Mother] spent the night at [Petitioner's] home with the child. [Petitioner] went to work the following morning. Thus, [Mother] had an opportunity to have unsupervised parenting time with the child for several hours in the home of [Petitioner]. At or about 10:00 a.m., [Petitioner] went to check on the child. From outside in the yard, she could hear the child screaming. She entered her home and checked on the child. The child's appearance is depicted in a photograph (see Exhibit 2). The child was extremely upset, her diaper was soiled, and she appeared to have not been

- 10 -

fed. [Petitioner] was not able [to] awaken [Mother] up. [Mother] remained asleep on the couch. [Petitioner] removed the child from the residence and left. It was only some time thereafter that [Mother] woke up. [Mother] claimed she had taken Seroquel and Cogentin that had been prescribed to her. Thus, [Mother] had an opportunity to begin having unsupervised visits with the child. However, she failed miserably at that opportunity.

(5) At no time did [Mother] present [Petitioner] with any proof of her compliance with her alcohol and drug treatment.

(6) As to her credibility, the Court is concerned that she had the child included on her EBT card for approximately one (1) year when the child was actually in the custody of [Petitioner].

(7) [Mother] claimed that she provided food 1 to 2 times in 2018 for the child, [Mother] acknowledged that she paid no formal child support. She claimed that she did give [Petitioner] $200.00 per week in 2016 to 2017 while employed at Campos but that [Petitioner] didn't want it. She provided no documentary proof. She claimed that she gave Missy [F.] money for the child. Ms. [F.] testified that she did give her money for the child a few times. She did not know the amount. Ms. [F.] did testify that [Mother] gave some groceries to [Patricia C.] for the child a "long time ago". [Petitioner] denied receiving $200.00 per week in child support.

(8) [Mother] admitted that during the four (4) month period of time prior to her incarceration, she was employed at Adient for approximately one (1) month and earned $10.00 per hour for a 40 hour week. She admits that she was able to work during that period of time. However, she paid no child support nor did she provide any necessary items for the child.

(9) Since being released from custody in or about July, 2019, [Mother] has been residing at the Oxford Sober Living House in Knox County, Tennessee. She claims that she has been free of illegal drugs for one (1) year, has a job, attends parenting classes, attends NA/AA with her sponsor, meets with her probation officer weekly, is subject to random drug screens, and attends church. Since she has no driver's license, she must walk to work or get a ride.

(10) At no time did [Mother] present [Petitioner] with proof of her compliance with the alcohol and drug treatment. At no time did [Mother] file a Petition with the Campbell County Juvenile Court requesting modification of the visitation arrangement.

Based on the foregoing facts, the Trial Court concluded that Mother had abandoned the Child by her failure to support the Child and her failure to visit the Child. The Trial Court found that Mother had not shown by a preponderance of the evidence that either her failure to visit or support the Child was not willful. The Trial Court further found that Mother had abandoned the Child by her actions which exhibited wanton disregard for the Child's welfare.

Concerning the best interest analysis, the Trial Court found as follows concerning Mother:

2. Factor No: 1-Whether parent has made adjustment of circumstances, conduct, or conditions as to make it safe and in the best interests of the child to be in the home of the parent-In this case, Mother is to be commended for her efforts toward recovery and sobriety. However, she is residing in a controlled environment with substantial supervision. The only testimony she offered was her own testimony regarding her progress. She has shown no convincing proof to the Court that she will remain sober or able to provide a home for the child. . . .

3. Factor No: 2-Whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies...; Inapplicable since Juvenile Court case was closed in or about 2017.

4. Factor No: 3-Whether the parent has maintained regular visitation or other contact with the child-In this case, neither parent has maintained regular visitation or contact with the child since at least 2017. This child is currently 3 1/2 years of age. The child has not had any meaningful contact or visitation for more than half of her life.

5. Factor No:4-Whether a meaningful relationship has been established between the guardian and the child-The proof clearly shows that this child has a meaningful and bonded relationship with [Petitioner]. No such bond exists with the child and either parent.

6. Factor No: 5-The effect a change of caretakers and physical environment would have on the child's emotional, psychological, and medical condition-Based on the facts of this case, a change of caregivers and a change from Petitioner's residence to another residence is likely to have an adverse effect on the child's emotional and psychological well-being. She is very well adjusted in her current environment. A witness described the child as "beautiful", "amazing" and "awesome". This witness stated that [Petitioner] and the child have a meaningful relationship and an appropriate home environment.

- 12 -

7. Factor No: 6-Whether the parent or guardian etc., has shown brutality, physical, sexual, emotional, or psychological abuse or neglect toward the child-In this case, both Mother and Father stipulated to a finding of dependency and neglect at an adjudicatory hearing regarding this child.

8. Factor No: 7-Physical environment/criminal activity/substance abuse-In this case, there are no concerns regarding the Petitioner's home or environment. Both parents have a history of criminal activity and significant substance abuse. Even though the parents' drug abuse has been an issue since the child was removed from their care in 2016, neither parent submitted documentation by way of nail bed analysis, hair follicle analysis, or any other analysis to convince that the Court they were no longer abusers of substances. There is no proof before this Court that either parent currently has the ability to care for this child in a safe and stable manner.

9. Factor No: 8-Mental and/or emotional status of parent or guardian-Inapplicable.

10. Factor No: 9-Payment of child support-Based on the facts hereinabove set forth, neither parent has paid child support consistent with the child support guidelines. Any support or any items provided for the child were merely token.

11. Other factors deemed important by the Court-This child has been in a stable and healthy environment since shortly after birth. That is the only home the child has known. Petitioner initially allowed visitation. Petitioner reached a point where she believed that an attempt should be made for unsupervised visitation. At that time, the child was approximately a year old. Although Mother was given the opportunity to prove she was ready to parent the child, she miserably failed. Neither parent made an effort to seek assistance from the Court in establishing a specific visitation plan. Since neither parent complied with the Juvenile Court Order by providing proof of compliance with their alcohol and drug treatment, this Court cannot place any blame on Petitioner for not establishing further sporadic visits.

12. Based on the foregoing, this Court does find by clear and convincing evidence that termination of the parental rights of both parents is in the best interests of this child.

In its "Findings of Fact, Conclusions of Law, and Opinion of the Court," the Trial Court directed Petitioner's counsel to prepare an order consistent with the Trial Court's opinion. The Trial Court thereafter entered an order, incorporating its "Findings of Fact,

- 13 -

Conclusions of Law, and Opinion of the Court" in its entirety and terminating both Mother's and Father's parental rights. Mother timely appealed the Trial Court's judgment terminating her parental rights.

**Discussion**

Although not stated exactly as such, Mother raises the following issues for our review on appeal: (1) Whether the Trial Court erred by finding that Mother abandoned the Child by failing to visit the Child in the four months prior to Mother's incarceration, (2) Whether the Trial Court erred by finding that Mother abandoned the Child by failing to financially support the Child in the four months prior to Mother's incarceration, (3) Whether the Trial Court erred by finding that Mother abandoned the Child by engaging in conduct prior to her incarceration that exhibited wanton disregard for the Child's welfare, and (4) Whether the Trial Court erred by finding that termination of Mother's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102

---

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[6] Tenn. Code Ann. § 36-1-113(i).

### B. Standards of Appellate Review

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

First, we will address the statutory grounds for termination found by the Trial Court. The Trial Court found that three abandonment grounds existed to terminate Mother's parental rights. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides abandonment by a parent as a ground for the termination of parental rights. Since Mother was incarcerated at the time the termination petition was filed, the relevant statute defining abandonment is Tennessee Code Annotated § 36-1-102(1)(A)(iv) (Supp. 2019). We note that the termination petition was filed in April 2019 and that the relevant statute in effect at that time defining abandonment stated as follows in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
>       * * *

- 17 -

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2019). The relevant statute in effect at the time the petition was filed provided as an affirmative defense that the parent's failure to visit or support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019). To prove this defense, a parent must establish his or her lack of willfulness by a preponderance of the evidence. *Id.* We will address the three abandonment grounds in turn. Mother testified that she was arrested on October 5, 2018. The Trial Court found in its order that the relevant four-month period as to Mother was June 5, 2018 through October 5, 2018. While we note that the correct four-month period extended from June 5, 2018 through October 4, 2018, it makes no difference in our analysis. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

Concerning abandonment by failure to visit, Mother argues that the Trial Court erred in finding this ground because Petitioner had prevented Mother from visiting the Child and, therefore, Petitioner's failure to visit was not willful. Specific to abandonment by failure to visit, pursuant to Tennessee Code Annotated § 36-1-102(1)(E), a parent must have failed to visit or engage in more than token visitation during the relevant four-month period. Tennessee Code Annotated § 36-1-102(1)(C) defines "token visitation" as visitation that, under the circumstances of the particular case, "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." The burden of proof was with Petitioner to prove by clear and convincing evidence that Mother had failed to engage in more than token visitation with the Child during the four months prior to Mother's incarceration. However, the burden was on Mother to prove by a preponderance of the evidence that her failure to visit was not willful.

It is undisputed that Mother had no visitation during the relevant four-month period. However, Mother claims that Petitioner had prevented her from visiting with the Child. The Trial Court considered this argument by Mother but ultimately rejected it. The most recent Juvenile Court's order allowed unsupervised visitation between Mother and the Child, at Petitioner's discretion, if Mother was in compliance with her alcohol and drug treatment. Mother had not filed a petition to modify this visitation order. Mother testified that the Juvenile Court had informed Petitioner during the final court hearing that occurred

after the failed unsupervised visit that the visits were at Petitioner's discretion and she could cease all visits if Petitioner thought Mother was high. At some point after the failed February 2017 unsupervised visit, Petitioner limited Mother's visitation with the Child. Although prior to the relevant four-month period, Petitioner denied a visit in March 2018 because she did not believe that Mother was clean. Additionally, during the four-month period, Petitioner denied Mother's request for visitation in September 2018, when Mother showed up unannounced to Petitioner's work with a copy of a drug screen. This was approximately one month prior to Mother's incarceration.

Concerning the ground of abandonment by failure to visit, the Trial Court concluded that Mother never provided Petitioner with proof of her compliance with her drug treatment program as required by the Juvenile Court's order. Although Mother showed up to Petitioner's work with what she claimed was a clean drug screen, a drug screen without more was not proof of Mother's compliance with a drug and alcohol program as required by the Juvenile Court's order. Additionally, Mother's verbally informing Petitioner that she was enrolled in a drug treatment program is not necessarily sufficient to satisfy the requirement of the order that Mother be in compliance with a drug treatment program. We note that with Mother's history of drug abuse and the failed unsupervised visit, it was not unreasonable that Petitioner wanted proof or documentation that Mother was actually in compliance with the drug treatment program to ensure her compliance with the Juvenile Court's visitation order. The Trial Court made it clear during trial that it would not require Petitioner to seek out whether Mother was in compliance with an alcohol and drug treatment program because Petitioner would be unable to obtain such information due to HIPAA.[7] Mother did not provide documentation of her compliance with a drug treatment program to Petitioner as was required for her to have an unsupervised visit with the Child. The visitation was at Petitioner's discretion and with Mother's failure to provide to Petitioner verification that she was in compliance with her drug treatment program, Petitioner's denial of visits with Mother was reasonable and in compliance with the Juvenile Court's visitation order. We agree with the Trial Court that Mother did not prove by a preponderance of the evidence that her failure to visit the Child during the relevant four-month period was not willful. We therefore find and hold, as did the Trial Court, that Petitioner proved this ground by clear and convincing evidence.

We next address the ground of abandonment by failure to pay child support for the Child. Mother argues on appeal that any failure to support by her was not willful because Petitioner had rejected support she had provided. Tennessee Code Annotated § 36-1-102(1)(D) requires that a parent provide more than token payments toward the Child's financial support. Tennessee Code Annotated § 36-1-102(1)(B) defines "token support" as support that, under the circumstances of the particular case, "is insignificant given the parent's means." It is undisputed that there was no child support order in this case.

---

[7] HIPAA refers to the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936.

However, the absence of a court order requiring a parent to pay child support does not negate that parent's obligation to pay support. *See In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008) ("Though Mother was not under a court order setting support for her children, such an order is not required."). Tennessee Code Annotated § 36-1-102(1)(H) provides that every parent eighteen years old or above is presumed to have knowledge of the legal obligation to financially support his or her children.

The Trial Court found that Mother claimed she had paid Petitioner $200 per week in 2016 and 2017 but that Petitioner did not want the money. The Trial Court, however, found that Mother had provided no documentation to support that claim. Mother had testified that she had provided clothing to Petitioner for the Child but that Petitioner did not need it and told her to take it back. There was evidence in the record that Mother had provided baby food and formula to Petitioner for the Child during the first year and that Mother had provided groceries to Patricia for the Child when Patricia was caring for her, which would have occurred before the Child was twenty months old. Patricia testified that Mother bought the Child a couple of outfits, "a toy here or there," and books to the Child with the last time being in late 2017. This was all prior to the relevant four-month period. Additionally, Mother claimed that she took food to the Child once or twice in 2018 but did not provide an exact time frame or identify whether it occurred within the relevant four-month period. Petitioner testified that Mother had provided the Child with a gallon of milk, some Easter candy, and an Easter basket in March 2018. Petitioner denied that Mother had ever provided her with financial support for the Child.

Mother was employed for approximately a month during the relevant four-month period and acknowledged that she had the ability to work during those four months. The Trial Court found that Mother had paid no child support or provided any necessary items for the Child during the four-month period. The evidence presented to the Trial Court does not preponderate against this finding by the Trial Court. Mother claims that Petitioner prevented her from supporting the Child and that any failure to support the Child was not willful. However, the Trial Court found that Mother had not proven by a preponderance of the evidence that her failure to support was not willful. Upon a review of the record, we find and hold, as did the Trial Court, that Petitioner had proven by clear and convincing evidence that Mother abandoned the Child by failing to provide financial support for her.

We next address whether the Trial Court erred by finding that Mother had abandoned the Child through her wanton disregard for the Child's welfare. Shortly after the Child's birth, Mother became intoxicated and wrecked a vehicle. Although the Child was not present in the car, Mother did have custody of the Child at that time. Mother was arrested for her second offense of driving under the influence (DUI) resulting from that incident, and Mother acknowledged she was later convicted of that DUI. Concerning wanton disregard, the Trial Court found that Mother had abused drugs and admitted during trial to being arrested twenty to twenty-five times for both felony and misdemeanor

- 20 -

offenses.  Mother admitted to using drugs after the Child was born, that she was likely high on prescribed medication during some of her visits with the Child, and that she had never actually worked a program before as she was currently doing at Oxford House.

In her appellate brief, Mother acknowledges her past conduct but focuses on her current sobriety and her efforts made during her incarceration and since her release from jail.  Due to these efforts, Mother argues that her actions did not constitute wanton disregard for the Child's welfare.  However, with the ground of abandonment by wanton disregard, we must consider Mother's actions prior to her incarceration.  *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2019) (defining abandonment in part as the parent having "engaged in conduct *prior to incarceration* that exhibits a wanton disregard for the welfare of the child" (emphasis added)).

This Court has previously held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).  Although Petitioner's attorney acknowledged during oral arguments that the Child was not present for any of Mother's criminal behavior, we note that this Court has previously held that it is not a requirement that the Child be physically present for a parent's behavior exhibiting wanton disregard for the child's welfare.  This Court previously held that a similar argument by a parent was disingenuous.  As this Court reasoned in *In re Serenity L.*, "The only reason why Mother did not subject the Child to harm or danger by Mother's actions is because Mother did not have custody of the Child during the time period when Mother was engaging in this criminal behavior."  No. E2014-02475-COA-R3-PT, 2015 WL 4594520, at *23 (Tenn. Ct. App. July 31, 2015).  As in *In re Serenity L.*, Mother in the present case knew she was a parent and chose to engage in criminal activity and drug use, which demonstrates a wanton disregard for the Child's welfare.  *See also In re Isabella G.*, No. M2016-02105-COA-R3-PT, 2017 WL 4407816, at *7 (Tenn. Ct. App. Oct. 3, 2017) ("Although engaging in criminal behavior in the children's presence certainly is relevant as to whether there was wanton disregard, we disagree that the exhibited behavior must be in a child's presence.").

Based on Mother's drug use and her criminal history, the Trial Court found that Mother had abandoned the Child by her wanton disregard for the Child's welfare.  We find and hold, as did the Trial Court, that Petitioner had proven by clear and convincing evidence the ground of abandonment by wanton disregard.

The final issue we address is whether termination of Mother's parental rights is in the Child's best interest.  The factors to be considered by courts in determining whether termination of parental rights is in a child's best interest are set forth in statute as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must

- 23 -

consider all of the statutory factors, as well as any other relevant proof any
party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its best interest analysis, the Trial Court considered each of the enumerated factors in Tennessee Code Annotated § 36-1-113(i). With regard to each factor, the Trial Court made relevant findings, and the evidence does not preponderate against those findings. Concerning whether Mother had made a lasting adjustment to her circumstances, the Trial Court commended Mother for her recent efforts toward sobriety, but stated that Mother had remained in a controlled environment during the duration of her sobriety, either incarcerated or at the Oxford House, and that Mother had not demonstrated that she could remain sober or provide a home for the Child. Mother had only been released from jail for four months at the time of trial. The Trial Court found that the only evidence Mother had presented regarding her progress was her own testimony. Although we note that Mother's family members, Mandi F., Missy F., and Patricia C., had testified on behalf of Mother to the positive changes they had seen in her, the witnesses' personal knowledge concerning Mother's progress at Oxford House was limited. Additionally, the Trial Court found that Mother had a history of significant substance abuse and criminal behavior and that there was no proof that Mother had the current ability to care for the Child in a safe and stable manner at the time of trial. Although Mother's drug use was the main concern during the Juvenile Court case, Mother had not provided any documentation to the Trial Court that she had in fact maintained her sobriety.

Due to Mother's drug use and criminal behavior throughout the Child's life, Mother had very little visitation with the Child to the extent that there was no bond remaining between Mother and the Child. Conversely, the Child is very bonded to Petitioner, who has cared for her and had custody of her for the majority of her life. Additionally, Mother had not contributed consistent support to the Child and the Trial Court deemed any items provided for the Child to be merely token support.

The Trial Court also found relevant the unsupervised visit that Mother had with the Child in February 2017 where Mother "miserably failed" at her opportunity to prove that she was ready to parent the Child. Mother argues that the fact that the Juvenile Court's order allowing unsupervised visitation was entered after that unsupervised visit "cannot go without notice." However, we note that the initial order allowing unsupervised visitation was entered prior to that visit in December 2016 and the subsequent order in April 2017 left that provision in place. The April 2017 visitation order still required Mother to be in compliance with her drug treatment program. Mother also testified that the Juvenile Court informed Petitioner that the visitation was at her discretion and that all visits could be stopped if Mother was high. According to Mother, "it wasn't even a month later and that's what happened." Mother had not provided to Petitioner proof of her compliance with a drug treatment program. We fail to see the significance of that final visitation order being

entered after the February 2017 visit when Mother had not complied with the visitation provision of the order.

The Trial Court found that the Child was well adjusted in her current environment and that removing the Child from Petitioner's care would have an adverse effect on the Child. The evidence does not preponderate against this finding by the Trial Court. Mother argues on appeal that when considering factor (5) concerning the effect that a change in caretakers or physical environment would have on the Child, the Trial Court "improperly ignored" that the Child had been accustomed to residing in both Petitioner's and Missy's households since the Child had been in the custody of Petitioner. We note that there was testimony presented that other family members had cared for the Child. Specifically, the Child had stayed with Missy for three nights a week for a long period of time and still visited Missy for significant periods of time each week. Additionally, evidence was presented that early in the Child's life, she had spent time at Patricia's home a couple of days a week. However, Petitioner has been the legal custodian and a constant in the Child's life since she was six weeks old, whereas Mother had very little visitation with the Child in the past couple of years and no remaining bond with the Child at the time of trial. There is no evidence that the Trial Court "ignored" the aforementioned arrangement between Petitioner, Missy, and Patricia. In fact, the Trial Court found in its findings of fact that while the Child resided with Petitioner, Petitioner had the assistance of Missy and other family members. We find no error in the Trial Court's analysis of this factor.

Additionally, Mother argues that there was "absolutely no evidence of brutality, physical, sexual, emotional, or psychological abuse toward the minor child, which is a significant part of factor number 6." Mother had stipulated during the Juvenile Court proceedings that the Child was dependent and neglected due to Mother's unavailability at the time resulting from her incarceration. Mother's argument completely ignores the words, "or neglect toward the child," found in factor (6). The courts must give effect to each word that the General Assembly included when enacting a statute. As such, the Trial Court's consideration of Mother's stipulation of dependency and neglect was not in error in its analysis of factor (6).

After its consideration of all relevant statutory factors, the Trial Court found that termination of Mother's parental rights was in the Child's best interest. Upon a review of the record, we find and hold that the evidence presented does not preponderate against the Trial Court's findings concerning the best interest analysis, and those factual findings by the Trial Court are clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. Therefore, we affirm the Trial Court's finding in this regard.

- 25 -

## Conclusion

The judgment of the Trial Court terminating Mother's parental rights to the Child is affirmed in all respects. This cause is remanded to the Trial Court for collection of the costs assessed below and for enforcement of the Trial Court's order terminating Mother's parental rights to the Child. The costs on appeal are assessed against the appellant, Scarlett B., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE